Betty WILLINGHAM, Plaintiff-Appellee-Cross-Appellant,

v.

James LOUGHNAN, Brian Buecler, Defendants-Appellants-Cross-Appellees.

No. 99-4005.

United States Court of Appeals,

Eleventh Circuit.

Aug. 15, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 90-08156-CV-UUB), Ursula Ungaro-Benages, Judge.

Before EDMONDSON, BLACK and McKAY[*], Circuit Judges.

EDMONDSON, Circuit Judge:

This case is mainly about qualified immunity and the deference afforded the findings of fact implicit in a general jury verdict in favor of Plaintiff in a section 1983 suit, considering Plaintiff's earlier criminal conviction related to the same events that are the subject of the section 1983 suit. The Officer Defendants in their individual capacities appeal the district court's denial of their Motion for Judgment as a Matter of Law and their Motion for Remittitur. Plaintiff cross-appeals the district court's grant of the City's post-trial motion for judgment.

The Officer Defendants first argue that Plaintiff was precluded from asserting a claim for a Fourth Amendment violation because of her conviction for attempted second degree murder of a police officer during the incident in question. They next argue that Plaintiff lacked a cognizable section 1983 claim because of the rule established in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). The Officer Defendants argue, most substantively, that they are entitled to qualified immunity because their acts violated no clearly established law at the pertinent time.

We review the district court's decision on a Motion for Judgment as a Matter of Law de novo, taking the evidence presented to the jury in the light most favorable to the non-moving party.[1] *See Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1331 (11th Cir.1999).

---

[*]Honorable Monroe G. McKay, U.S. Circuit Judge for the Tenth Circuit, sitting by designation.

[1]In this case, materially different stories were presented to the jury by Plaintiff and Defendants. Because the jury, by general verdict, found for Plaintiff we will accept her version of events except to the extent that her testimony in this case calls into question the validity of her previous conviction for assault and attempted murder during this incident.

PROCEEDINGS BELOW

In October 1987, Plaintiff Betty Willingham ("Plaintiff") was shot by police officers during an incident outside of her home. Plaintiff was then convicted of attempted, second-degree murder of one of the police officers and of battery on another police officer there that night.

In 1990, Plaintiff filed suit against several defendants alleging a variety of state and federal claims. Defendants' motions for summary judgment in 1992 and 1995 were denied by the district court. The 1995 motion was denied on the grounds that material issues of fact remained in dispute which, if resolved in Plaintiff's favor, would deprive the Defendants of qualified immunity. This court—in an unpublished opinion—affirmed the denial of qualified immunity on interlocutory appeal in September 1997. *See Willingham v. Loughnan,* 124 F.3d 1299 (11th Cir.1997)(Table).

The federal civil rights claims against Brian Beucler and James Loughnan (the "Officer Defendants") and the City of Boynton Beach (the "City") proceeded to trial.[2] The jury returned a verdict in favor of Plaintiff for $5,000,000.00 in compensatory damages against the Officer Defendants and the City, and $500,000.00 in punitive damages against each officer in his individual capacity. The Officer Defendants and the City filed motions for judgment as a matter of law, for a new trial and for remittitur. The district court granted the City's motion for judgment as a matter of law,[3] but denied the Officer Defendants' motions. The Officer Defendants now appeal the denial of their motion for judgment as a matter of law and motion for remittitur.[4] Plaintiff filed a cross-appeal of the judgment in favor of the City.

BACKGROUND

The facts in this case are disputed on many relevant details by the parties involved. The difficult question presented in this case is what findings of fact can a court determine a jury made when the jury by general verdict in the section 1983 suit found for Plaintiff—and therefore all facts and inferences supported

---

[2]The state law claims against the Officer Defendants and defendant police chief were voluntarily dismissed before trial.

[3]We affirm the trial court's judgment for the City because, after our own review of the record and briefs, we agree that Plaintiff offered no evidence from which a reasonable jury could conclude that the City was on notice of the need to train or to supervise their officers better in the area of the use of force. *See Gold v. City of Miami,* 151 F.3d 1346, 1351 (11th Cir.1998) ("[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.")

[4]The Officer Defendants make no argument on appeal that the district court erred in failing to grant them a new trial and do not request we overturn the district court's order denying them a new trial.

by the evidence must be drawn favorably to Plaintiff—but, certain evidence presented in the civil case cannot (as a matter of law) be taken as fact because it contradicts findings of fact necessarily made by the earlier criminal-case jury when that jury found Plaintiff guilty—beyond a reasonable doubt—of attempted second degree murder and of battery on a police officer. We first summarize the testimony of key witnesses to the events and will determine in our discussion of the case what facts must be taken as true because of the earlier conviction for assault and attempted murder.

*Testimony of Plaintiff Betty Willingham*

Plaintiff testified that she came to the door of her home on the night in question, responding to a knock on her door that woke her. When she opened the door, she saw her brother, Arnold Sims ("Sims"), near his truck and saw Officer Ronald Panucci ("Panucci") and his police dog out by the road in front of the house. Sims and Panucci were in an argument and were standing about six or seven feet from each other. While standing in the doorway, Plaintiff called other members of her family on the phone to tell them the police were harassing Sims.

Panucci then started moving toward Sims with the leashed dog. The confrontation between Panucci and Sims then became physical; Panucci said something, and the dog began to attack Sims. The dog began to bite Sims below the knee. Plaintiff found two bottles in her kitchen near the door and threw them at the dog, which was closer to her than Panucci or Sims. Although the bottles hit the dog, it would not stop biting Sims. Plaintiff then grabbed a knife in the kitchen sink and threw the knife at the dog. She said that she never had a second knife, that she never threw a glass at a police officer and that she never tried to throw anything at Panucci. Plaintiff never stepped completely out of the doorway. Plaintiff said that she saw Loughnan and another police car at some point before the shooting but did not hear anyone yelling at her.

Immediately after throwing the knife at Panucci, Plaintiff reached up to pull her hair in frustration while screaming for the dog to stop biting Sims. Just as she was reaching up, she was shot and fell back into the kitchen. Plaintiff says she was shot within a "split second" of throwing the knife.[5] After she was shot, one of the Officer Defendants told her, "If I had the opportunity, I'd shoot your ass again." Shortly thereafter, paramedics arrived and took her to the hospital.

*Testimony of Officer Loughnan*

---

[5]No argument was made, nor was evidence presented that the Officer Defendants had knowledge that both were going to shoot Defendant. The evidence supports only a finding that the officers made simultaneous (but independent decisions) to shoot Plaintiff.

Loughnan went to the scene of the pertinent events after receiving a radio call that Panucci had stopped a car and needed assistance. When Loughnan arrived, he saw that Panucci and Sims were near the house with Panucci's back to the door. The dog was at heel at Panucci's side. Plaintiff was out on the top stoop of her doorway, cursing at Panucci and telling him to leave Sims alone. Panucci and Sims were yelling at each other and then became engaged in physical struggle. Loughnan concentrated on Plaintiff because (having had some dog training in the military) he did not want to get between a dog and its target. Plaintiff then threw a bottle at Panucci, which bounced off the back of Panucci's leg or back. Loughnan then approached Plaintiff, and she threw a glass at him striking him in the shoulder.

Loughnan told Plaintiff she was under arrest. He grabbed her by her bathrobe to apprehend her. Plaintiff resisted, tearing the garment and a necklace from her as she fled into the house and closed the door behind her. Loughnan could hear Plaintiff rummaging through drawers in the kitchen. At that point Loughnan moved away from the stoop and said he might have drawn his gun and held it by his side. Plaintiff reemerged from the house holding two knives. She threw one at Panucci that bounced off his leg or back. Loughnan began yelling repeatedly "drop the knife." Plaintiff turned and looked at Loughnan and saw the gun pointed at her. She then turned and lunged toward Panucci. Loughnan fired four bullets at Plaintiff, stopping her and spinning her around so that she fell in her doorway.[6] Loughnan was somewhere between two and six feet from Plaintiff.

*Testimony of Beucler*

Beucler was working with Officer Blum the night Plaintiff was shot. They went to the area where Panucci was trying to stop Sims after they heard the stop announced on the radio. They were aware at the time that Sims' truck had not stopped when directed to do so by Panucci. When Beucler and Blum arrived at the scene, a civilian car drove by and stopped. Blum approached the car to direct the occupants to move on.

Beucler was focused on Panucci and Sims. He could see that they were in an argument. The dog was sitting at Panucci's side. At some point, Beucler was close enough to the confrontation to put his hand on Sims's shoulder. Beucler saw Sims push Panucci, and Panucci respond by grabbing Sims. The dog then

---

[6]Both Loughnan and Beucler fired two "double-taps" at Plaintiff. Officers are trained to fire a "double-taps" instead of a single shot. According to their training, a "double-tap" is considered one shot. No argument was made at trial or on appeal that the practice of shooting a "double-tap" itself constitutes excessive force.

attacked Sims, but Beucler could not tell if the dog actually bit Sims. Beucler backed away from the struggle when the dog became involved.

While Beucler was getting involved with Sims and Panucci, he suddenly heard a voice yelling "drop the knife" several times. Beucler saw that neither Panucci nor Sims had a knife; so he looked around to where the sound was coming from and noticed, for the first time, Plaintiff on the stoop. He saw Plaintiff make a throwing motion and saw the knife kick up off the ground. But he did not see the knife hit Panucci. Beucler then saw that Plaintiff had another knife. She was moving toward Panucci's back with the knife raised. Beucler then fired four shots at Plaintiff. The shots stopped her forward motion, and she fell back into the doorway of the house.

Beucler ran up to Plaintiff to check on her condition. He saw the knife next to Plaintiff on the kitchen floor but did not touch the knife. Beucler said his total time at the scene before the shooting was no more than 75 seconds, and it was only a matter of "split seconds" between the time he heard Loughnan yelling "drop the knife" and his own firing on Plaintiff.

DISCUSSION

*Issue Preclusion and* Heck v. Humphrey

As a preliminary matter, we dispose of the Officer Defendants' arguments that Plaintiff has no cognizable section 1983 claim because of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and that her section 1983 claim is precluded by collateral estoppel. Because the verdicts in both the criminal-trial and in this case are general verdicts, the specific facts found by the juries are not available to us. But, after thorough review of the criminal-trial transcript provided to us, we conclude that whether the Officer Defendants' acts were reasonable under the circumstances was not necessarily determined by the criminal trial jury. Also, a finding of excessive force by the jury in this civil case does not necessarily call into question the validity of section 1983 Plaintiff's criminal conviction.

Although we conclude that neither *Heck* nor issue preclusion prevents Plaintiff's claims in this case, the doctrine of issue preclusion does operate to limit what facts we can accept were found by the jury in this civil case for the qualified-immunity decision. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980) (rules of collateral estoppel apply to Section 1983 suits). With this idea in mind, we now turn to the decisive question: whether the district court erred in denying the Officer Defendants judgment as a matter of law on the basis of qualified immunity.

*Qualified Immunity*

In 1995, Defendant Officers moved for summary judgment on the grounds of qualified immunity. The district court determined that material issues of fact in dispute prevented a grant of summary judgment.[7] We affirmed the district court's denial of summary judgment in a brief opinion specifically noting that we were not considering arguments based on issue preclusion or *Heck v. Humphrey.*[8] The case then proceeded to trial to resolve the material issues in dispute. After the jury's verdict for Plaintiff, Defendants filed their post-trial motions.

In denying the Officer Defendants judgment as a matter of law, the district court again said that whether the officers were reasonable in the use of force or entitled to qualified immunity turned "on issues of fact that were properly resolved by the jury." This decision was error. When the rules of law are enforced, Plaintiff cannot prevail in this case. The Officer Defendants were entitled to qualified immunity under the facts supported by the evidence at the civil trial (taken most favorably to Plaintiff) but limited by the facts earlier determined conclusively by the criminal-trial court.

The applicability of qualified immunity is a question of law to be decided by the court. *See Harrell v. Decatur County,* 22 F.3d 1570, 1578 (11th Cir.1994) (Dubina, J., dissenting) *approved on rehearing* 41 F.3d 1494 (11th Cir.1995). When a court considers whether or not a government official is entitled to qualified immunity, the specific facts of the case before the court are of critical importance; and the specific facts of the precedents are almost always very important as well.[9] *See Saucier v. Katz,* 531 U.S. 991, 121

---

[7]Although this conclusion is what the court announced, this view of how qualified immunity works at the summary judgment stage is not exactly correct. What should have been said is, when plaintiff's view of the disputed facts was credited, defendants were simply not due qualified immunity under the specific facts of the case in the light of the clearly established law at the time. But we understood the district court's decision and affirmed it.

[8]At the time a transcript of the criminal trial had not been provided to the district court, and the Officer Defendants had not yet presented some of these arguments to the district court.

[9]We note at this point that we have said that when the question of qualified immunity turns on specific questions of fact, the use of special verdicts or written interrogatories can be very helpful to a judge in determining the legal question of whether qualified immunity applies. *See Priester v. City of Riviera Beach,* 208 F.3d 919, 926 n. 6 (11th Cir.1999); *Cottrell v. Caldwell,* 85 F.3d 1480, 1487 (11th Cir.1996) (when Defendant requests written interrogatories or special verdicts, it is error for the district court to refuse to issue them to the jury). But Defendant Officers did not request, nor did the court use special verdicts or written interrogatories to determine, disputed issues of fact in this case. Therefore, all lawfully disputed factual issues and all reasonable inferences therefrom must be taken in the light most favorable to Plaintiff. *See Priester,* 208 F.3d at 925-26 n. 3 (citing *Iacobucci v. Boulter,* 193 F.3d 14, 23 (1st 1999)).

S.Ct. 2151, 2156, --- L.Ed.2d ---- (2001) (determining whether right clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition"); *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (noting that pertinent qualified immunity question in probable-cause case is "fact-specific" question of whether reasonable official could have believed, in light of clearly established law, that official's behavior was lawful under circumstances); *Lassiter v. Alabama A&M University Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (*en banc*) (stating that "general propositions" have little to do with qualified immunity, and bright line that must be crossed to surrender qualified immunity "is not found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances") (quoting *Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.1989)); *see also Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1700, 143 L.Ed.2d 818 (1999) (saying "the right allegedly violated must be defined at the appropriate level of specificity ..."). Therefore, when reviewing a district court's denial of a motion for judgment as a matter of law in a qualified immunity case, we must make certain assumptions about what facts the jury found in reaching its general verdict for Plaintiff. *See Priester,* 208 F.3d at 923 n. 2.

Briefly stated, in the typical case where the jury reaches a verdict in the face of disputed issues of fact, we simply accept as true the version of facts for which evidence (if it was more than a scintilla) was presented by the party who won the jury verdict. But, under the law applicable in this case, the civil jury was not legally entitled to second-guess Plaintiff's conviction for attempted murder of officer Panucci and for battery of officer Loughnan.[10] Based on our review of the record from the criminal trial, we conclude that the jury in the earlier criminal case must have concluded, at the very least, (1) that Plaintiff threw a knife at Panucci, (2) that Plaintiff did attempt to kill Panucci when she threw the knife at him, and (3) that she did strike Officer Loughnan by throwing a glass at him. And these facts must be taken as true and final when we

---

[10]The district court instructed the jury with these words: "[t]he Court has taken judicial notice of, and, therefore, you are instructed as a matter of law, that plaintiff, Betty Willingham, was convicted of committing the felony of attempted second-degree murder of Officer Ron Panucci on October 7th, 1987. Under Florida law, this means that the jury in the criminal prosecution of Betty Willingham decided that the State of Florida had proven beyond a reasonable doubt that the plaintiff intended to cause the death of Ronald Panucci and the perpetration of an act imminently dangerous to another and evinced a depraved mind, regardless of human life, although without premeditation, and committed on overt act in furtherance of that attempt."

The court gave a similar instruction regarding the conviction for battery of Loughnan concluding "[y]ou must accept these convictions as established facts in your deliberations and may not reject them or otherwise question their validity."

decide what other facts are supported by the civil-trial evidence, taken in the light most favorable to Plaintiff.[11]

So, in the light of the facts necessarily and finally determined by the criminal-trial jury, the facts that might be properly found by the civil jury taking the evidence presented in the light most favorable to the Plaintiff, are that Plaintiff obtained a number of objects from the kitchen and threw them at Panucci and Loughnan.[12] She threw a glass at Loughnan, striking him in the shoulder; and then she picked up a knife in the kitchen and threw it at Panucci's back in an attempt to kill him. She immediately thereafter raised her hands to her head and, at that time, was shot four times by each of the Officer Defendants. The shots were fired within a split-second of her assault on Loughnan and of her attempt to kill Panucci, but while she was unarmed. She was also standing in the doorway to the kitchen where she had obtained the bottles and knife she had already thrown at the officers.

The question for the purposes of qualified immunity is this one: whether Defendant Officers violated clearly established federal law in 1987, by shooting Plaintiff within a "split second" after she attacked two officers—having just tried to kill one of them—while she, at the moment, was not in the physical control of the police and was standing unarmed but near the area from which she had already obtained four objects she

---

[11]Actions arising under Section 1983 are subject to the rules of collateral estoppel. *See Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 420, 66 L.Ed.2d 308, (1980). And the courts have applied issue preclusion either to dismiss entire section 1983 claims or to prevent introduction of evidence on a previously decided fact. *See Brown v. Hialeah,* 30 F.3d 1433, 1437 (11th Cir.1994) (affirming district court's decision to preclude introduction of evidence that Plaintiff did not attempt to shoot Defendant after Plaintiff had already pleaded guilty to attempted murder of Defendant); *Simmons v. O'Brien,* 77 F.3d 1093, 1097 (8th Cir.1996) (section 1983 claim alleging excessive force leading to coerced confession was precluded by state court decision that confession was voluntary).

When considering whether to give preclusive effect to a state court judgment, we apply the estoppel rules of the state that rendered the judgment. *See Marrese v. American Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985); *Vazquez v. Metropolitan Dade County,* 968 F.2d 1101, 1106 (11th Cir.1992).

In Florida, collateral estoppel may be employed to bar prosecution or argumentation of an ultimate fact or facts necessarily decided in the prior proceeding. *See State v. Strong,* 593 So.2d 1065, 1067 (Fla. DCA 4th 1992); *United States v. DeMarco,* 791 F.2d 833, 836 (1986). Florida also allows Defendants in a later civil suit to make use of defensive collateral estoppel even though they were not a party to the earlier criminal proceeding. *Zeidwig v. Ward,* 548 So.2d 209 (Fla.1989).

[12]We recognize and have considered Plaintiff's highly successful impeachment of the officers' testimony in this case. Because of these efforts, we understand that the civil jury was at liberty to believe very little of the Officer Defendants' side of the story. The facts recited here, therefore, are taken from those facts we conclude were finally determined by the criminal-trial jury, plus Plaintiff's own civil-trial testimony, and other undisputed evidence in the civil trial.

had used as weapons, at least one of which was a potentially lethal weapon.

The Supreme Court has recently offered guidance on how to address properly the question of qualified immunity in the context of excessive force cases. In *Saucier,* the Court decided that whether an officer behaved in an objectively reasonable manner in the context of the merits of the excessive force claim is a completely separate and distinct question from whether the officer behaved objectively reasonably under the clearly established preexisting law for qualified immunity purposes. *See* 121 S.Ct. at 2158-59.[13]

Deadly force is permitted under the Fourth Amendment when an officer "has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). The test for whether excessive force is used is an objective test asking whether a reasonable officer would believe that this level of force is necessary in the situation at hand. *See Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Most important, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* We have also said that "[f]rom the vantage point of an officer whose life is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." *Menuel v. City of Atlanta,* 25 F.3d 990, 995 (11th Cir.1994).

We (with reluctance and doubt) accept that the law would allow a reasonable jury to find—given the Plaintiff's evidence, including evidence of Plaintiff being unarmed when shot, of the nature of the weapons she had used and the manner of their use, of the number of police officers present and their location and so on—that the amount of force applied by the Defendant Officers was not reasonable in this case, notwithstanding that Plaintiff had just finished battering and attempting to kill police officers. *See Fitzgerald v. McDaniel,* 833 F.2d 1516, 1519 (11th Cir.1987) (a jury's assessment of the reasonableness of a police officer's conduct is a factual finding by which the court is bound unless appellant can show an absence of probative facts to support the finding).

The crucial inquiry, however, is whether the law was already clearly established at the time of the

---

[13]*Saucier* directly rejects Plaintiff's main argument that a finding of excessive force precludes the qualified immunity defense. That Defendants' conduct has been ultimately determined to be unreasonable under the excessive force analysis does not decide whether the law was already clearly established at the time Defendants acted that what they were doing, given the circumstances, necessarily violated federal law.

incident that the use of deadly force was unlawful under the particular circumstances faced by the officers in this situation. An officer is entitled to qualified immunity if a reasonable officer, under the circumstances, might have thought that the use of force did not violate the federal law at the time of the incident. *See Saucier,* 121 S.Ct. at 2158-59. The principles and goals of the doctrine of qualified immunity are particularly important in cases like this one: where police officers are confronting an unpredictable and dangerous situation in which split-second decisions can make the difference between life and death.

Qualified immunity protects from suit all but the plainly incompetent or one who is knowingly violating the federal law. *Lassiter,* 28 F.3d at 1149. Government officials are not required to err on the side of caution. *See Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). And qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

Police officers cannot be expected to delay or to second-guess decisions that must be made in the heat of a dangerous confrontation with a person engaged in violent criminal conduct. Whatever the evidence at the civil trial also shows—given the fact of Plaintiff's 1992 criminal convictions—the factual situation confronted by the Officer Defendants in this case must be basically this one: 1) Plaintiff had just assaulted one officer, attempted to kill another officer; 2) she was not subdued; and 3) she was standing in the door to the kitchen where she had, just moments before, obtained weapons with which she had tried to kill one police officer and assaulted another. Unless the federal law in October 1987 was already clearly established that—under these circumstances—shooting Plaintiff, even if she was unarmed at the moment, did constitute excessive force in violation of the Fourth Amendment, the Defendant Officers are entitled to qualified immunity.

Almost always, to establish the law clearly in the context of the Fourth Amendment, a materially similar case must have already decided that what the police officer was doing was unlawful. *See Priester v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000) ("[N]o bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.")[14] Plaintiff presents

---

[14]We also noted in *Priester* that there is a narrow exception to the requirement for materially similar cases when the officer's conduct falls "so far beyond the hazy border between excessive and acceptable force." But, this case, where the police fired within a split second of an attempted murder on one of them,

no earlier cases that would establish that the Officer Defendants' acts, under the circumstances, were clearly illegal at the time of this incident.  Our own survey of the case law indicates that in 1987 it was not clearly established that it constituted excessive force to shoot a person under the circumstances presented in this case.  Moreover, as recently as 1995, we concluded an officer was entitled to qualified immunity for shooting in 1990 an unarmed man who had just attacked the police officer with a flashlight and had then returned to the man's car.  *See Harrell,* 22 F.3d at 1581 (Dubina, J., dissenting) *approved on rehearing* 41 F.3d 1494.

Because the federal law was not already clearly established law in 1987 that it constituted excessive force in violation of the Fourth Amendment to shoot a person under the circumstances presented in this case, we conclude that the Defendant Officers are entitled to qualified immunity.

## CONCLUSION

Because we have concluded that the Officer Defendants are entitled to the defense of qualified immunity, it is unnecessary for us to reach the question of remittitur.  For the Officer Defendants, the district court's judgment is REVERSED.  For the City, the district court's judgment is AFFIRMED.

REVERSED IN PART and AFFIRMED IN PART.

---

is no such case.