[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12224
_____

D.C. Docket No. 7:17-cv-01445-LSC


JOHN DEE CARRUTH, an individual,

Plaintiff - Appellant,

versus

ROBERT J. BENTLEY, an individual,
DAVID BYRNE, an individual,

Defendants - Appellees.


_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(November 7, 2019)

Before MARCUS, JULIE CARNES, and KELLY,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by designation.

John Dee Carruth, the former CEO of Alabama One Credit Union, sued former Governor of Alabama Robert Bentley and his legal advisor, David Byrne, after Alabama One was taken into conservatorship by a state agency and he was terminated. Carruth alleged that the Governor and his counsel conspired with others to improperly exert regulatory pressure on the credit union, in order to induce Alabama One to settle lawsuits brought by a friend and former law partner of Byrne. Carruth filed an array of constitutional claims against Bentley and Byrne under § 1983 -- including violations of the Equal Protection Clause, a substantive due process claim, a Takings Clause claim in violation of the Fifth Amendment, the denial of his First Amendment right to petition government, retaliation for exercising his right to petition the courts, and conspiracy to violate his rights, along with three supplemental state law claims. The district court dismissed all of the civil rights claims on qualified immunity grounds and declined to entertain the supplemental claims.

Carruth now appeals the dismissal of his complaint. After thorough review, we affirm. The first defect in the complaint is that Carruth does not plausibly allege that the Governor or his legal advisor was responsible for causing his injuries. The decision to place Alabama One in conservatorship and the concomitant decision to terminate Carruth's employment were made by Sarah Moore, the Administrator of the Alabama Credit Union Administration (ACUA),

2

and approved by the ACUA Board of Directors.  Carruth has pled no facts plausibly establishing that the Governor and Byrne made the decisions causing Carruth harm.  What's more, even if we could assume away the basic causation problem permeating the entire complaint, Carruth also has failed to plausibly allege that Bentley and Byrne violated his clearly established constitutional rights. From the face of the complaint, it is clear that he cannot defeat their entitlement to qualified immunity.  The district court did not err in dismissing the federal claims.

I.

John Dee Carruth served as the Chief Executive Officer of Alabama One Credit Union from 1998 until 2015.  Like all other credit unions in the state, Alabama One was regulated by the Alabama Credit Union Administration, an independent state agency.  In December 2011, the ACUA and the National Credit Union Association (NCUA), an agency of the federal government, determined that Alabama One was in violation of a regulatory cap placed on the percentage of loans that could be made to any one member of the credit union.  The violation related to a series of "Member Business Loans" made to a used-car broker named Danny Butler, a long-time member of Alabama One.  The ACUA and NCUA issued a joint Letter of Understanding and Agreement (LUA) requiring Alabama One to reduce its concentration of Member Business Loans, directed an outside investigation by a law firm into the actions of Carruth and other senior

3

management officials, and ordered an accounting audit. The investigations did not turn up evidence of wrongdoing and the LUA was lifted in April 2013.

On July 16, 2013, a group of attorneys that Carruth refers to as the "Smyth Group" -- Jay Smyth, his firm Lewis Smyth Winter Ford LLC, Albert Lewis, and Bobby Cockrell -- filed four lawsuits against Alabama One and various employees, including Carruth. The plaintiffs were past business associates of Butler, who claimed that Alabama One was responsible for the losses they sustained in connection with the loans made to Butler. A fifth lawsuit followed in March 2015. Carruth characterizes these cases as an "old-fashioned 'stick-up,'" pursued in the hope that Alabama One would choose to "pay off" the plaintiffs in order to avoid extended litigation.

Finding little success in these lawsuits, the Smyth Group allegedly hatched a plot "to improperly increase the regulatory pressure on and governmental and public scrutiny of Alabama One and Carruth in order to coerce Alabama One to settle the Smyth Lawsuits." Smyth reached out to his former law partner and friend David Byrne, Jr., the chief legal advisor to then-Governor Bentley. On November 25, 2013, Smyth, Byrne, Governor Bentley, State Senator Gerald Allen, and former Alabama Supreme Court Justice Bernard Harwood allegedly held a meeting at the state capitol. According to an email from Smyth, the meeting's purpose was to allow the parties to "speak freely" on "Alabama One Issues" in

4

order to decide "what actions would seem to be most . . . appropriate for the State of Alabama." Smyth told Senator Allen in a separate email that he hoped Governor Bentley would direct the ACUA to "pick up where it left off," claiming that "conditions at Alabama One have only deteriorated."

According to the complaint, on January 24, 2014 another meeting took place at the state capitol, which was attended by Smyth, Byrne, Carrie McCollum (another legal advisor to Governor Bentley), ACUA Administrator Larry Morgan, NCUA and ACUA officials, and a disgruntled former Alabama One employee named Lori Baird. At this meeting, Smyth led Baird through a presentation that provided "inside information" on wrongdoing within Alabama One. Eleven days later, Smyth sent a memorandum to State Senator Allen, copying Byrne and McCollum, claiming that Alabama One "has become so impaired that the only responsible action would be for the [ACUA] to take prompt remedial action." He requested that certain Alabama One employees be suspended and that Alabama One be placed into conservatorship.

About a week later, on February 12, 2014, Smyth sent another memorandum to Byrne and Senator Allen, and in an email to Byrne's assistant he wrote:

> Thanks for your help, Pam. I believe now that everyone (perhaps with the notable exception of Larry Morgan) is on the same page re Alabama One issues. I have confidence the Governor will act decisively on this. David (Byrne) is providing good leadership, as usual.

5

Smyth sent another email to Byrne, Allen, and others the following day, in which he discussed a lawsuit two of his clients had filed against Alabama One.  He wrote:

> [The plaintiffs] continue to hope for prompt and effective remedial action against Alabama One by the ACUA acting in concert and coordination with the Governor's office.  They are, quite literally, depending on the Bentley administration's showing up like the cavalry in a John Wayne movie.  While we all expect these civil plaintiffs to ultimately prevail in their various lawsuits, the results from the courthouse will not materialize soon enough to save them from suffering serious -- and wholly unnecessary -- damages in the meantime.

During a break in a deposition in one of the Smyth-Alabama One lawsuits, on February 27, 2014, Smyth said to an Alabama One attorney, "If you don't settle our lawsuits today and pay us money today, the regulators will do bad things to Alabama One tomorrow."  The next day, Carruth and three other Alabama One employees were suspended by the ACUA.  Administrator Morgan later said that "both Mr. Byrne and Governor Bentley wanted something to happen at Alabama One, they wanted suspensions," and that Bentley told Morgan to suspend the Alabama One employees or resign.  Morgan said that he did not know who prepared the suspension letters.  That evening, Smyth sent an email to Byrne with the subject line "Alabama One" expressing his appreciation.

The ACUA allowed the suspended employees to return to work on March 21, 2014, after they agreed to release all claims against the ACUA.  The next day, Morgan resigned from his position as Alabama Credit Union Administrator.  On

6

April 15, 2014, Bentley appointed Sarah Moore as the new Administrator. Moore had no professional experience in credit union regulation. Prior to her appointment, she was an executive at Colonial Bank in Montgomery, Alabama, where she worked with Byrne while he was the bank's general counsel. During the interview process, Byrne told her that Alabama One was a "large problem" that she'd have to deal with.

Ms. Moore officially took office on July 1, 2014 as the new Administrator of the Alabama Credit Union Administration. A few days later, she met with Carruth and told him she was ordering an examination of Alabama One by an outside auditing firm. ACUA and NCUA conducted a joint examination in August, and they then issued a Preliminary Warning Letter directing Alabama One to stop making Member Business Loans. In March 2015, the ACUA informed Alabama One that it would be receiving a Cease and Desist Order, a more severe sanction requiring Alabama One to undergo more extensive outside review of its lending activities and its management.

In June 2015, Alabama One and Carruth filed their first lawsuit in federal district court against the Smyth Group, Byrne, Moore, and others, alleging violations of various constitutional provisions and several claims under Alabama law. On August 26, the complaint was amended to add Governor Bentley as a defendant. The following day, on August 27, 2015, some sixteen months after

7

Sarah Moore had taken the reins, the ACUA placed Alabama One in conservatorship and removed Carruth as CEO. The ACUA appointed itself conservator of Alabama One and delegated its authority to Moore to run Alabama One. Moore, in turn, denied Carruth indemnification for his legal expenses related to his challenge to the conservatorship order.

Carruth then commenced this lawsuit in federal district court against Bentley and Byrne under § 1983 on August 25, 2017. He claimed that (1) his termination and the denial of indemnification was a taking in violation of the Fifth Amendment, (2) the defendants violated his right to the equal protection of the laws, (3) they violated his substantive due process rights, (4) they interfered with his First Amendment right to petition the courts, (5) they retaliated against him because of the lawsuit he filed against the Smyth Group in 2015, and, finally, (6) they conspired to deprive him of his rights. Carruth added three state law claims, for tortious interference, intentional infliction of emotional distress, and civil conspiracy.

In a lengthy order, the district court granted Bentley and Byrne's motion to dismiss, concluding that they were entitled to qualified immunity on each of Carruth's § 1983 claims. Having dismissed all of the federal claims, the court declined to exercise supplemental jurisdiction over the state law claims and dismissed them without prejudice.

8

This timely appeal followed.[1]  Carruth now challenges the district court's conclusion that Bentley and Byrne are entitled to qualified immunity and that his equal protection, takings, due process, retaliation, and conspiracy claims should be dismissed.  He also says that the district court erred by not granting leave to amend his complaint.

## II.

We review the dismissal of a complaint under Rule 12(b)(6) de novo.  Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018).  We accept all facts alleged in the complaint as true and draw all inferences in the plaintiff's favor.  Id.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Carruth argues that the district court erred in granting Bentley and Byrne qualified immunity.  Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

---

[1] This case against defendants Bentley and Byrne is one of four appeals currently pending in our Court arising out of the conservatorship of Alabama One.  See also Powell v. Ala. Credit Union Admin., No. 18-11176 (11th Cir. argued Apr. 9, 2019); Carruth v. Moore, No. 18-11192 (11th Cir. argued Apr. 9, 2019); Carruth v. Lewis Smyth Winter Ford LLC, No. 18-13272 (11th Cir. argued Apr. 9, 2019).

9

have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The doctrine is designed to permit "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  It "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'"  Id. (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

"In order to receive qualified immunity, the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir. 1991) (internal quotations omitted)).  If the official makes this showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  Id.  To defeat qualified immunity, "(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct."  Taylor v. Hughes, 920 F.3d 729, 732 (11th Cir. 2019).  In this case, we look only to decisions from the United States Supreme Court, this Court, or the Supreme Court of Alabama for clearly established law.  See Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1328 (11th Cir. 2003).

10

A.

For starters, Carruth claims that the district court erred at the first step in finding that Bentley and Byrne acted within their discretionary authority.  An official is entitled to qualified immunity only if he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).  The question is essentially whether the actions "are of a type that fell within the employee's job responsibilities."  Id. at 1265.  The inquiry is two-fold: "We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  Id.

Two actions allegedly tie Bentley and Byrne to Administrator Moore's decision to place Alabama One into conservatorship and terminate Carruth: Bentley's appointment of Moore as the new ACUA Administrator on April 15, 2014; and Byrne's comment to Moore when she was interviewed for the position that Alabama One would be "a large problem."  Both were part of the legitimate job-related functions of the defendants.  An Alabama statute expressly provides that the Alabama Credit Union Administrator "shall be appointed by the Governor."  Ala. Code § 5-17-41.  It could not be clearer, then, that Bentley's

11

appointment of Moore was a legitimate job function and that it fell well within his powers as the Governor of the state.

As for legal advisor Byrne, a different Alabama statute empowers the Governor to "employ an attorney or attorneys to advise him in his official capacity." Id. § 36-13-2. Bentley and Byrne assert that this statutory provision and the Governor's general executive authority bring Byrne's statement to Moore within the province of his discretionary functions as the Governor's advisor. Under the Constitution of Alabama, "[t]he supreme executive power" of the state is vested in the governor, and he has the duty to "take care that the laws be faithfully executed." Ala. Const. §§ 113, 120. The Supreme Court of Alabama has explained that "these express constitutional provisions, all of which are of course unique to the office of governor, plainly vest the governor with an authority to act on behalf of the State and to ensure 'that the laws [are] faithfully executed.'" Riley v. Cornerstone Cmty. Outreach, Inc., 57 So. 3d 704, 719 (Ala. 2010); see also id. ("[E]verything pertaining to the executive department is at all times pending before the Governor in his official capacity." (quoting State v. Simon, 99 A.2d 922, 925 (Me. 1953))).

The regulation of Alabama One fell within the Governor's lawful job functions because the Alabama Credit Union Administration executes and enforces Alabama's laws regarding credit unions and the Governor has the duty to ensure

12

that the laws are faithfully executed.  See Ala. Code § 5-17-40(a) (providing that the ACUA "shall administer the laws of this state which regulate or otherwise relate to credit unions in the state").  The Governor also has statutory authority to hire lawyers to serve as his advisors and aid him in the execution of his duties.  When an advisor seeks to inform an official appointed by the Governor of the administration's regulatory priorities or discuss some issue falling under that official's portfolio, that advisor is also performing a discretionary job-related function.

Carruth argues, nevertheless, that Byrne and Bentley did not execute their job-related functions "in an authorized manner," since they allegedly coerced and threatened ACUA Administrators Larry Morgan and Sarah Moore to take unwarranted regulatory actions against Carruth and Alabama One.  This argument has been rejected by our precedent:  at this stage in the analysis, we "temporarily put[] aside the fact that [the official's actions] may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."  Holloman, 370 F.3d at 1266.  That means we must set aside, for now, the claim that Bentley and Byrne undertook these actions in order to wrongfully pressure Alabama One to settle the Smyth cases or in order to retaliate against Carruth for bringing his first lawsuit against them.  For present purposes, the question is whether the official's

13

actions are of the sort that fall within the "'arsenal' of powers" the official is given "to accomplish her goals." Id. at 1267. In this setting, we do not ask whether the defendants acted illegally, because "[f]ramed that way, the inquiry is no more than an 'untenable' tautology." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (quoting Sims v. Metro. Dade Cty., 972 F.2d 1230, 1236 (11th Cir. 1992)). A plaintiff cannot plead around qualified immunity simply by saying that the official was animated by an unlawful purpose. The exception would swallow the rule.

Governor Bentley had the authority to appoint the Administrator of the Alabama Credit Union Administration and, as part of his constitutional authority as the state's chief executive, the power to direct and inform her actions as a regulator. And Byrne was a statutorily authorized legal advisor to Governor Bentley; their relevant actions fell within their discretionary authority.

### B.

Bentley and Byrne submit that Carruth's complaint fails to plausibly plead any constitutional violation of the First, Fifth, or Fourteenth Amendments because he cannot show that Bentley and Byrne were the legal cause of his injuries. "As with any common law tort," a § 1983 plaintiff "must establish an adequate causal link between the alleged harm and the alleged unlawful conduct." Dixon v. Burke County, 303 F.3d 1271, 1275 (11th Cir. 2002). Carruth's complaint tells a detailed

14

story about the influence and control that the defendants -- and Byrne in particular -- had over the ACUA.  But the factual allegations relate almost entirely to the Administrator (Larry Morgan) who served in that position before Sarah Moore assumed her duties, and Moore (not Morgan) was the official who ultimately acted against Carruth and Alabama One.  The problem for Carruth is that his claims do not plausibly allege that Bentley and Byrne caused the injuries he sustained.

For one thing, Carruth's only allegations on this score are pled at the highest order of abstraction and therefore must be disregarded.  Other than the claim that Byrne told Moore in her interview for the Administrator position in 2014 that Alabama One would be "a large problem," the allegations involving Moore are stated in a wholly conclusory manner:  thus, for example, the complaint alleges that Moore ordered an audit of Alabama One "[p]ursuant to and in furtherance of the Defendants' scheme," and that Moore conserved Alabama One and terminated Carruth while "acting at the direction of" Bentley and Byrne.  These claims are strikingly similar to those the Supreme Court disregarded in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  See, e.g., id. at 680–81 (holding that the allegations that an individual was the "principal architect" of a policy or was "instrumental" in adopting it were conclusory and not entitled to the presumption of truth); see also McCullough v. Finley, 907 F.3d 1324, 1333–34 (11th Cir. 2018) (holding that allegations that defendants "adopted" and "administered" an unlawful scheme "at

15

the highest level" were conclusory).  We, therefore, need not and indeed cannot take it as true that Bentley and Byrne directed Administrator Moore to place the credit union in a conservatorship or fire Carruth.

Moreover, Administrator Moore and the other members of the Board of the ACUA sit in the middle of the causal chain allegedly running from Bentley and Byrne to Carruth's injuries.  The requisite "causal relation" for a § 1983 claim "does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." Dixon, 303 F.3d at 1275.  The Dixon case involved an appointment to a local board of education.  To fill the seat, a grand jury was required to select an individual from those who applied and submit that person's name to a state court judge, who had the final approval.  Id. at 1273.  An advisor to the grand jury suggested that the new member should be of the same race and gender -- white and male -- as the outgoing board member; the grand jury followed that advice and the judge approved their selection.  A female applicant sued the advisor, the grand jury foreman, and the County under § 1983.  The Court held that the claims against the individual defendants failed on causation grounds.  Id. at 1275.  As for the foreman, the Court concluded that other "acts includ[ing] the votes of independent grand jurors and the action of an independent state Judge" vitiated the chain of causation.  Id.  A panel of this Court observed that the case against the advisor was

16

"even weaker," since "the intervening free, independent, and volitional acts of the Grand Jury and the state Judge" stood between his advice and the hiring decision. Id. Because of these intervening steps and because neither defendant "possess[ed] or assert[ed] any coercive force that subverted the individual free will of those who voted," the causal chain was broken. Id.

So too here. Importantly, Carruth does not make any allegations that impugn or otherwise undermine the independence of the other members of the ACUA Board, none of whom noted their dissent to the conservatorship. See Ala. Code § 5-17-8(f) (requiring majority approval by the ACUA Board to appoint a conservator). Under a straightforward application of Dixon, then, there were "intervening free, independent, and volitional acts" between any improper acts by the defendants and the decisions taken by Administrator Moore and the members of the Board of Directors of the ACUA that caused Carruth's injuries.

Carruth disagrees, asserting that this case is like a "cat's paw" Title VII case where a plaintiff attempts to show causation by establishing "that the decisionmaker followed [a] biased recommendation without independently investigating the complaint against the employee." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). He says that Sarah Moore was under the control of Bentley and Byrne, and the Board simply followed Moore's tainted decision without making a truly independent and deliberative decision. The

17

allegations in the complaint do not support Carruth's argument. In fact, Carruth has offered precious little to suggest that Moore herself was not an independent deliberative actor -- at most, he has presented only Byrne's comment some sixteen months before the conservatorship decision was taken that Alabama One would be a problem, the fact that the Governor appointed her to run ACUA after the campaign to pressure Alabama One had been ongoing for several years, and the time span of 13 months from Moore's appointment to the conservatorship decision. That's not much to create an inference that Moore was not an autonomous decisionmaker, and the conclusory allegation that she was acting at the direction of Byrne and Bentley must be disregarded under Iqbal.

Moreover, even if the complaint could somehow be read to plausibly claim that Moore was acting under the influence of Byrne and Bentley -- and we do not think the complaint can fairly be read that way -- the complaint does not even remotely suggest that the other members of the Board of the ACUA were somehow under the sway of Bentley and Byrne, or that Moore "possess[ed] or assert[ed] any coercive force that subverted the individual free will of those who voted." Dixon, 303 F.3d at 1275. Quite simply, Carruth's complaint does not plausibly allege that the Governor and his counsel were the cause of Carruth's injuries, and so he cannot establish the necessary nexus between these defendants and any violation of his constitutional rights.

18

C.

Even if Carruth had adequately pled causation, however, he still would be unable to overcome Bentley and Byrne's entitlement to qualified immunity for reasons specific to each claim. We address each in turn, starting with equal protection.

1.

Carruth argues that "[d]espite the similarity between 2012/2013 Alabama One and Carruth and 2015 Alabama One and Carruth, regulators treated them far differently," in violation of the Equal Protection Clause. He has asserted what is called a "class of one" equal protection claim, arguing that he was singled out for arbitrary and irrational mistreatment, and he attempts to use the state's earlier treatment of himself and Alabama One as a proper comparator to establish that his treatment in 2015 was an outlier. His claim fails.

The Supreme Court first explicitly recognized the "class of one" equal protection theory in Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam). In Olech, the plaintiff claimed that the Village demanded a 33-foot easement as a condition of connecting her property to the municipal water supply, while it only asked for a 15-foot easement from similarly situated property owners. She alleged that the difference was "irrational and wholly arbitrary," and said that a 15-foot easement was "clearly adequate." Id. at 565. The Supreme Court held

19

that the plaintiff's complaint stated a valid "class of one" equal protection claim.

Id.

In a later case, the Court explained that the class of one theory applies when there is "a clear standard against which departures, even for a single plaintiff, [can] be readily assessed." Engquist v. Or. Dep't of Agr., 553 U.S. 591, 602 (2008). The Court went on:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Id. at 603. Thus, the Supreme Court held that the class of one theory "has no application" in the context of public employment decisions, since it would open up too many discretionary governmental decisions to equal protection claims. Id. at 607.

We conclude that the class of one equal protection theory similarly has no application to the decision to place Alabama One in conservatorship or to terminate Carruth as its CEO. As the district court observed, it is difficult to "envision a better example of discretionary decisionmaking than whether to conserve a Credit Union and terminate certain of its employees." The decision to

conserve a credit union and depose its leadership is a major one, as Carruth tells us, and it requires the ACUA to make "a vast array of subjective, individualized assessments." Id. at 603. For a state regulatory agency to do its job effectively, it must be able to take into account all of the relevant facts and circumstances of the individual cases before it. In Griffin Industries, Inc. v. Irvin, 496 F.3d 1189 (11th Cir. 2007), this Court held that state government officials were entitled to qualified immunity from a similar class of one claim brought by a company that operated a chicken rendering plant. Id. at 1207. The company claimed that the officials subjected the plant to stricter environmental regulation than other similarly situated facilities. Id. at 1194–95. We rejected the claim, explaining that unlike in Olech, the regulatory decisions involved were "multi-dimensional," with "varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time." Id. at 1203. When the challenged government action "is not the product of a one-dimensional decision" it is more difficult to make out a class of one claim. Id. at 1203–04. The various decisions made by the defendants and other state officials leading up to the conservatorship of Alabama One are similarly complex and multidimensional. Carruth has not pointed to any "one-dimensional decision" that shows that he and Alabama One were treated arbitrarily or dissimilarly from similarly situated entities.

21

Moreover, and equally fatal to this claim, Carruth's attempt to use a prior version of himself and Alabama One as a comparator finds no support in our case law. Carruth has cited no case in which this Court, the United States Supreme Court, the Supreme Court of Alabama, or any other court, for that matter, has held that a plaintiff can make out a class of one claim by using an earlier version of himself as the "similarly situated" comparator. In fact, the cases say without fail that a class of one claim is available when a plaintiff has been "intentionally treated differently from others similarly situated." Olech, 528 U.S. at 564 (emphasis added); see also Engquist, 553 U.S. at 601; Griffin Indus., 496 F.3d at 1202. That language naturally suggests that a plaintiff must point to someone else who received or is receiving more favorable treatment. Carruth appears to recognize that there is no clearly established law in support of his theory. His opening brief says that this appeal presents an "issue of first impression" of "[w]hether an earlier 'version' of an individual subject to state regulation can be an adequate comparator to the current 'version' of that same individual for purposes of a 'class of one' claim." Initial Br. of Appellant i. If the question is one of first impression, the defendants are almost certainly entitled to qualified immunity, since there is rarely a clearly established violation of law in the absence of supporting case law.

22

Carruth cites to no case, and we can find none, in which this Court or the Supreme Court has approved a class of one equal protection theory that involved regulatory decisions remotely similar to those made by the Alabama Credit Union Administration in this case. Nor has he cited to any case indicating that a plaintiff may use an earlier version of himself as a comparator to prove a class of one claim. Since there is no clearly established law establishing that Carruth's alleged differential treatment violated the Equal Protection Clause, Bentley and Byrne are entitled to qualified immunity.

2.

Bentley and Byrne are also entitled to qualified immunity on the due process claim. Carruth's complaint asserts a violation of his substantive due process rights -- indeed, the relevant heading reads, "COUNT III – 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS)" -- and the district court therefore properly construed it as a substantive due process claim. Carruth now says that he intended to bring a procedural due process claim. He made no such argument in district court, and, accordingly, we need not consider it. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (quotations omitted)).

23

If we did, however, Carruth still could not defeat Bentley and Byrne's claim of qualified immunity because he fails to cite to any clearly established law that would have placed the defendants fairly on notice that their conduct violated his substantive or procedural due process rights.  In the first place, this Court has expressly held that "an employee with a property right in employment is protected only by the procedural component of the Due Process Clause, not its substantive component."  McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc).  So to the extent that Carruth asserts a substantive due process claim based on the deprivation of his right to continued employment as CEO of Alabama One, controlling precedent holds that it must fail.

And even if we grant Carruth the benefit of construing his complaint as having somehow included a procedural due process claim, he has not met his burden of plausibly alleging the violation of a clearly established constitutional right.  A terminated government employee cannot bring a procedural due process claim "before the employee utilizes appropriate, available state remedial procedures."  Id.  And even "[w]hen a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy."  Id.  Assuming that Carruth had a property right in his continued employment -- a highly debatable proposition, since any property right he held was

24

probably extinguished by the conservatorship[2] -- Carruth also must show that state law does not afford him an adequate remedial procedure for the deprivation of his rights.

To prevail, then, Carruth must allege that he has attempted to make use of whatever state law avenue for relief is available to him and that the remedial procedure is inadequate.  By statute, Alabama law provides for judicial review of a conservatorship decision and of a decision by the ACUA Board to suspend an employee.  See Ala. Code § 5-17-8(g) ("Not later than 10 calendar days after the date on which the Alabama Credit Union Administration takes possession and control of the business and assets of a credit union pursuant to subsection (f), officials of the credit union who were terminated by the conservator may apply to the circuit court for the judicial circuit in which the principal office of the credit union is located for an order requiring the administration to show cause why it should not be enjoined from continuing possession and control.").  Indeed, Carruth's separate lawsuit against Administrator Moore and the ACUA now pending in this Court began as an action under Alabama Code § 5-17-8 challenging the conservatorship and seeking reinstatement.  See Notice of Removal at 11–88,

---

[2] Alabama Code § 5-17-8(m) provides that "[a]fter taking possession of the property and business of a credit union through conservatorship, the conservator may terminate or adopt any executory contract to which the credit union may be a party."  The district court concluded that this provision implied that Carruth had no entitlement to continued employment upon the conservatorship of Alabama One, since the conservator had the apparently unrestricted power to terminate any contracts made by the credit union, including employment contracts.

25

Carruth v. Moore, No. 7:16-cv-01935-LSC (N.D. Ala. Dec. 2, 2016).  Carruth has offered us no reason to conclude or even suspect that this procedure would be inadequate to protect his due process rights.  Carruth's claim for reinstatement under Alabama law is being heard in a competent court of law.  In short, he has not shown a clearly established violation of his right to due process.

3.

Carruth's Takings Clause claim also fails because there is no clearly established law on this matter either.  He has not cited to any case from this Court, the United States Supreme Court, or the Supreme Court of Alabama holding that a state regulatory agency's decision to place an institution into conservatorship and terminate its executives is an unconstitutional taking, nor can he establish that this is the rare case where a constitutional violation would be apparent without clarifying law.  See, e.g., United States v. Lanier, 520 U.S. 259, 271 (1997) (explaining that in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question"); Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) ("[T]he words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law. (emphasis omitted)).  A constitutional violation can be clearly

26

established without factually similar case law when "no reasonable officer could have believed that [the defendants'] actions were legal," Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002), but this case plainly does not fall within that category and Carruth does not claim that it does.

It is Carruth's burden to establish that Byrne and Bentley are not entitled to qualified immunity and he has not met it. None of the cases cited by Carruth even involved the Takings Clause; rather, all of them were due process cases. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 536 (1985); Econ. Dev. Corp. of Dade Cty. v. Stierheim, 782 F.2d 952, 953 (11th Cir. 1986) (per curiam); Fowler v. Johnson, 961 So. 2d 122, 128 (Ala. 2006). Carruth's failure to meet his burden compels us to affirm the district court's dismissal of this claim. Bentley and Byrne are entitled to qualified immunity on this one too.

4.

As for his First Amendment retaliation claim, Carruth argues primarily that the district court erred in dismissing the claim on causation grounds. As we've noted already, we agree with the district court's causation analysis and in fact conclude that it requires dismissal of all of Carruth's § 1983 claims. But Carruth's retaliation claim has an additional flaw.

"To state a retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally

27

protected; second, that the defendant's retaliatory conduct adversely affected the [plaintiff]; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). The parties do not dispute, for present purposes, whether Carruth engaged in protected conduct or whether the purported retaliatory action had an adverse effect that would deter "a person of ordinary firmness" from engaging in that conduct. See id. at 1253. The only question is whether Carruth has plausibly alleged a causal connection between Carruth's protected acts -- filing his first lawsuit in federal court and, more particularly, adding Governor Bentley as a defendant in August 2015 -- and the alleged retaliatory actions.

The problem is that the causal connection Carruth points to contradicts the bulk of the allegations in his complaint. For the purposes of this claim, Carruth asserts that the defendants terminated his employment as an act of retaliation for his 2015 lawsuit. He notes that the ACUA put Alabama One in conservatorship and terminated his employment the day after he added Governor Bentley as a defendant in that lawsuit. Carruth suggests that the temporal proximity between the events implies a causal relationship. But a heading in his complaint asserts, in sharp contrast, that "Conservatorship Was The Goal All Along For The Smyth Group And Their Co-Conspirators." Original Compl. ¶ 147. He also alleged that "[f]rom the beginning of the discussions between the Defendants and the Smyth

28

Group regarding putting improper regulatory pressure on Alabama One and Carruth, Smyth made no secret of his end-goal -- conserve the credit union [and] remove management." Id. (emphasis added).  The over-arching narrative is that the defendants were part of a conspiracy dating back well before his 2015 lawsuit was filed.

Carruth lacks any plausible account of how conserving Alabama One and replacing its leadership was both Bentley and Byrne's ultimate goal for years and an act of retaliation for Carruth's protected activities in 2015.  In his brief, he argues:

> While Carruth does allege that, as early as November 20, 2013, attorney Jay Smyth began first discussing with state officials the issue of conserving Alabama One, Carruth also alleges that the final nail in the coffin was when Carruth joined Appellee Bentley as a defendant in a federal lawsuit.  It was not until this event happened that the Appellees made the decision to carry through with the "goal".

Reply Br. of Appellant 23.  In other words, Carruth now says that Bentley and Byrne wanted to fire him all along, but they did not decide to actually do it until Carruth engaged in the protected conduct.

If we take all of the facts as alleged as true, however, the claim of retaliation is facially implausible.  The thrust of his complaint is that there was an ongoing and longstanding conspiracy to put regulatory pressure on Alabama One that resulted in conservatorship and Carruth's termination.  It is only in response to the defendants' argument on appeal that he asserts that the defendants didn't really

29

decide to conserve Alabama One until August 2017.  There are <u>no</u> allegations in the complaint referring to discussions between the defendants and ACUA Administrator Moore around the time that Carruth amended his complaint to include Bentley as a defendant.  He does not say or even suggest that after Carruth filed his lawsuit, Bentley and Byrne told Moore to pull the trigger.  In fact, Carruth specifically alleged that "the decision to conserve Alabama One and terminate Carruth had been made and communicated <u>well before</u> the ACUA Board met in Montgomery on August 27, 2015" to make the formal decision.  Original Compl. ¶ 144 (emphasis added).  Apparently, Carruth now argues that "well before" means "the day before," immediately after the defendants learned that Bentley was being included as a defendant.  We are unpersuaded.

Carruth offers no factual allegations to support the claim that the decision to place Alabama One into conservatorship and terminate his employment was made because of his protected activities, and the "obvious alternative explanation" is that the decision was made long before that date, since that is the story told by Carruth's complaint.  See <u>Iqbal</u>, 556 U.S. at 682; <u>see also</u> Initial Br. of Appellant 15 (claiming that "remov[ing] Carruth . . . was the goal of the conspiracy").  Thus, this claim fails too because Carruth's complaint does not state a plausible causal connection between his protected activities and the defendants' acts of retaliation.

30

5.

Finally, we come to Carruth's conspiracy claim.  As we see it, this one fails for two independent reasons.  The district court dismissed it because he "made no argument as to why Defendants are not entitled to qualified immunity in regards to his conspiracy claim."  He has still failed to offer any argument on this point.  Again, it is his burden to show that the defendants are not entitled to qualified immunity, and he has not attempted to surmount it.

Moreover, "to sustain a conspiracy action under § 1983 . . . a plaintiff must show an underlying actual denial of its constitutional rights."  GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11th Cir. 1998), abrogated on other grounds as recognized by Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010).  For the reasons set forth above, we do not think that Carruth has plausibly alleged the denial of any of his constitutional rights.

* * *

The long and short of it is that the district court did not err in dismissing Carruth's federal claims with prejudice.[3]  Carruth has not plausibly alleged that

---

[3] Carruth also argues that the district court erred in dismissing his claims with prejudice and denying him leave to amend his complaint.  But Carruth never moved to amend his complaint in district court.  "A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."  Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc).  Carruth -- who at all times was represented by counsel -- did not move to amend his complaint or suggest to the district court how he would do

31

Bentley and Byrne were the legal cause of his injuries.  Nor has he otherwise plausibly alleged violations of his rights under the Equal Protection Clause, the Due Process Clause, the First Amendment, or the Takings Clause.  He cannot overcome Bentley and Byrne's claims to qualified immunity.  His § 1983 claims were properly dismissed by the district court.

**AFFIRMED.**

---

so, and he has not even told us in his appellate briefs how he would attempt to cure his complaint. The district court did not abuse its discretion by declining to grant leave to amend sua sponte.