[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No: 18-11176
_____

D.C. Docket No. 7:17-cv-00470-LSC


TIM POWELL,
DENISE CRAWFORD,
EDWIN HARRELL,
CHARLIE WEST,
LARRY SEXTON,
RICHARD POWELL,
MARTIE PATTON,

Plaintiffs-Appellants,

JOHN DEE CARRUTH,

Plaintiff,

versus

UNITED STATES OF AMERICA,

Petitioner,

THE ALABAMA CREDIT UNION ADMINISTRATION,
SARAH MOORE, in her official capacity as
the Administrator of the Alabama Credit Union Administration,

Defendants-Appellees,

MARK CANTOR,

Defendant.

_____

No: 18-11192

_____

D.C. Docket No. 7:16-cv-01935-LSC

JOHN DEE CARRUTH,

Plaintiff-Appellant,

TIM POWELL,

Plaintiff,

versus

SARAH MOORE, in her official Capacity as
the Administrator of the Alabama Credit Union Administration,
THE ALABAMA CREDIT UNION ADMINISTRATION,
MARK CANTOR,
UNITED STATES OF AMERICA,

Defendants-Appellees,

HAROLD G. MCCLELLAN,

Respondent.

_____

No: 18-13272

_____

D.C. Docket No.7:15-cv-01089-LSC

ALABAMA ONE CREDIT UNION,
a not-for-profit financial institution, et al.,

Plaintiffs,

JOHN DEE CARRUTH,

an individual,

                                        Plaintiff-Appellant,

versus

DAVID BYRNE,
an individual, et al.,

                                               Defendants,

JUSTICE D SMYTH, III,
"Jay", an individual,
LEWIS SMYTH WINTER FORD LLC,
a domestic limited liability company,
ALBERT G. LEWIS, III,
an individual,

                                    Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(January 16, 2020)

Before ROSENBAUM, BRANCH, and HIGGINBOTHAM,[*] Circuit Judges.

PER CURIAM:

These three appeals all arise from the same set of alleged facts: a supposed conspiracy by Alabama officials and regulators, federal regulators, and private lawyers to take over the Alabama One Credit Union ("Alabama One"), fire its senior leadership, and settle lawsuits with those private lawyers' clients on terms the lawyers found favorable. The plaintiffs appeal the district court's grant of

---

[*] Honorable Patrick E. Higginbotham, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

defendants' motions for summary judgment and, with respect to certain defendants, the grant of motions to dismiss. After the benefit of oral arguments and careful consideration, we affirm the district court in full.

## I.

Defendant Alabama One is a state-chartered and federally insured credit union. The plaintiff in two of the cases, John Carruth, was formerly the CEO of Alabama One, from approximately 1998 until 2015. The plaintiffs in the third case are Tim Powell, Denise Crawford, Edwin Harrell, Charlie West, Larry Sexton, Richard Powell, and Martie Patton, who were all officers or board members of Alabama One.

Like other credit unions, Alabama One was regulated by the Alabama Credit Union Administration ("ACUA"), an independent state agency which is statutorily authorized to regulate Alabama's state-chartered credit unions.[1] Larry Morgan served as ACUA's administrator from February 2011 to March 2014.

---

[1] Alabama Code § 5-17-8 authorizes ACUA to conserve a state-chartered credit union in certain circumstances.  Specifically, Ala. Code § 5-17-8(f) (2017) provides:

> (f) The Administrator of the Alabama Credit Union Administration, with the approval of a majority of the Credit Union Board of the Alabama Credit Union Administration, ex parte without notice, may appoint the Alabama Credit Union Administration as conservator and immediately take possession and control of the business and assets of any state-chartered credit union in any case in which any one of the following occurs:
>
> > (1) The Alabama Credit Union Administration determines that the action is necessary to conserve the assets of any state-chartered credit union or the interests of the members of the credit union.
> > (2) A credit union, by resolution of its board of directors, consents to the action by the Alabama Credit Union Administration.

4

Alabama One found itself in regulatory trouble after it made member business loans to Danny Butler, one of its members, in excess of the percentage of loans a credit union is allowed to make to one member or associated group of members under the relevant regulations. *See generally* 12 C.F.R. pt. 723 (defining and regulating member business loans). In 2011, ACUA and the National Credit Union Administration ("NCUA") determined some action was in order, and issued a "letter of understanding and agreement"[2] to Alabama One regarding the Butler loans. The letter of understanding and agreement required Alabama One to hire an outside law firm to investigate the actions of Carruth and other senior management and hire an outside accounting firm to perform a fraud audit and loan accounts verification. The investigations did not reveal any evidence of wrongdoing, and the letter of understanding and agreement was lifted in April 2013.

In July 2013, four lawsuits were filed against Alabama One in Alabama state court, alleging various unlawful actions, including fraud, by borrower Butler and

---

(3) There is a willful violation of a cease-and-desist order which has become final.

(4) There is concealment of books, papers, records, or assets of the credit union or refusal to submit books, papers, records, or affairs of the credit union for inspection to any examiner or to any lawful agent of the Alabama Credit Union Administration.

[2] *See* 12 U.S.C. § 1786(s)(1)(A) ("The Board shall publish and make available to the public on a monthly basis . . . any written agreement or other written statement for which a violation may be enforced by the Board, unless the Board, in its discretion, determines that publication would be contrary to the public interest.").

Alabama One. Defendants Jay Smyth ("Smyth") and Albert Lewis ("Lewis"), then of the firm Lewis, Smyth, Winter, & Ford, LLC, eventually represented the plaintiffs in all four cases.[3] A fifth lawsuit was filed in March 2015.

As that litigation was ongoing, Smyth started communicating with various government officials, including David Byrne, Jr., the chief legal advisor to then-Governor Robert Bentley, and individuals with ACUA and NCUA. In particular, emails from late 2013 and early 2014 from Smyth and Lewis to Byrne, state Senator Gerald Allen, and occasionally to Governor Bentley, show that Smyth and Lewis communicated their desire for the replacement of Alabama One's leadership and, eventually, their desire to place Alabama One into conservatorship. During the same time period, Smyth and Lewis also attended meetings at the State Capitol; these meetings often included ACUA examiners.

On February 24, 2014, Smyth emailed Byrne, Senator Allen, and others (but not ACUA) asking that ACUA take action that would "stay" proceedings in one of the lawsuits his client had brought against Alabama One. A few days later, on February 27, 2014, at a deposition for one of those lawsuits, Smyth told an attorney working for Alabama One that if Alabama One did not settle, regulators would do "bad things" to Alabama One. The next day, ACUA (under Morgan's leadership)

---

[3] These actions are not legally related to the appeals before us.

6

suspended Carruth and three other employees.[4]  That evening, Smyth sent an email with the subject line "Alabama One" to Byrne, commending him on his service to the governor.

On March 3, 2014, Carruth and the other suspended Alabama One employees filed an action in Alabama state court challenging their suspensions.  On March 21,

---

[4] Independent of its authority to conserve a credit union, ACUA also has the authority to suspend credit union officials for certain misconduct under Ala. Code § 5-17-8(d), which provides:

> The Administrator of the Alabama Credit Union Administration may suspend from office and prohibit further participation in any manner in the conduct of the affairs of a credit union, any director, officer, committee member, or employee who has done any one of the following:
>
> > (1) Committed any violation of a law, rule, or regulation.
> >
> > (2) Engaged or participated in any unsafe or unsound practice in connection with the credit union business.
> >
> > (3) Engaged in any act, omission, or practice which constitutes a breach of fiduciary duty to the credit union.
> >
> > (4) Committed any fraudulent or questionable practice in the conduct of the credit union's business which endangers the credit union's reputation or threatens insolvency.
> >
> > (5) Violated any condition imposed in writing by the administrator or any written agreement made with the administrator.
> >
> > (6) Concealed, destroyed, removed, falsified, or perjured any book, record, paper, report, statement, or account related to the business and affairs of the credit union.
> >
> > (7) Unless the administrator directs otherwise, the prohibition against participation in the conduct of the affairs of a credit union shall remain effective until it is rescinded by a vote of the Credit Union Board of the Alabama Credit Union Administration.

2014, ACUA allowed the suspended employees to return to work, after they signed an agreement releasing their claims against ACUA. The very next day Morgan resigned as administrator of ACUA.

On April 15, 2014, Governor Bentley appointed Sarah Moore as administrator of ACUA, who had worked with Byrne in the past. As Administrator, she was the chief executive officer of ACUA. She officially took office on July 1, 2014. A few days after taking office, Moore informed Carruth that she was going to order another examination of Alabama One by a third-party firm.

In late 2014 Smyth sent texts and emails to Moore requesting meetings regarding Alabama One. Her responses indicated a willingness to meet, but only with additional ACUA employees present. In March 2015, Smyth emailed Byrne, complaining that Moore had not taken more aggressive action against Alabama One. On April 2, 2015, ACUA issued a cease-and-desist order to Alabama One, a more severe sanction that required Alabama One to undergo more extensive outside review of its lending activities.

On June 29, 2015, Alabama One and Carruth filed a federal lawsuit against the Smyth Group, Byrne, Moore, and others, alleging violations of § 1983, various constitutional provisions, and Alabama state law. And on June 30, 2015, the

8

examiners from ACUA and NCUA issued their annual Examination Report,[5] which detailed the conclusions of both the federal and state examiners about the state of affairs at Alabama One.  Defendant Mark Cantor, an examiner at NCUA, was assigned to supervise NCUA's investigations of credit unions in the region that included Alabama One at the time. On August 27, 2015, ACUA's board, including Moore, voted to place Alabama One in conservatorship. ACUA then terminated Carruth, Powell, and the other plaintiffs.  Moore testified that her motivation for these actions was based, at least in part, on the Examination Report.

## A. Procedural History

The plaintiffs filed multiple actions which are the subjects of these three appeals. According to the plaintiffs, the conservatorship of Alabama One and the termination of Carruth and other board members and officers of Alabama One were the culmination of a conspiracy originating from Smyth's and Lewis's desire to gain favorable settlements in their clients' cases against Alabama One. The plaintiffs alleged that Smyth and Lewis reached out to Byrne, the governor's counsel, and requested that the state impose regulatory sanctions on Alabama One and Carruth, in the hopes that such regulatory pressure would persuade Alabama One to reach a

---

[5] While the contents of the Examination Report are considered confidential, ACUA confirmed at oral argument that the existence of the Examination Report is public.  Some of the district court's various opinions are sealed to protect the Examination Report's contents. Because our analysis does not turn on the details of those contents, we do not need to reference the portions of the district court's discussion that include the details in the Examination Report.

settlement that was favorable to them in the pending lawsuits. According to the plaintiffs, the alleged conspiracy resulted in the appointment of Byrne's friend Moore as administrator of ACUA, and Moore's subsequent actions to place Alabama One into conservatorship and terminate Carruth, Powell, and the other plaintiffs. We recount the procedural histories of the three cases before turning to the merits.

1. Appeal Nos. 18-11176 & 18-11192

We consolidated two of these appeals, 18-11176 and 18-11192, because they present virtually identical issues and argument; the 16-part statement of issues in the appellants' briefs are virtually identical. The two cases have the same defendants: ACUA, Moore, Cantor, and the United States. But each case has different plaintiffs-appellants. In 18-11176, the plaintiffs are Powell and other board members and officers of Alabama One. In 18-11192, the plaintiff is Carruth.

Powell and Carruth filed their nearly identical suits on September 8, 2015, in the Circuit Court of Tuscaloosa County, Alabama, asserting state law and constitutional claims against Moore and ACUA. Specifically, they alleged that Moore and ACUA conspired with various private individuals (including Smyth and Lewis, who are the defendants in the third appeal here, *Carruth v. Smyth*, No. 18-11372) and government officials to conserve Alabama One and extract settlements out of it for the ongoing litigation by Smyth and Lewis.

10

On October 3, 2016, Powell and Carruth amended their complaints to join as a co-defendant Cantor, alleging that he conspired with Moore and state officials to take over Alabama One by way of the conservatorship. They allege that Cantor recommended to Moore and ACUA that Alabama One should be placed into conservatorship, stating at a meeting with ACUA that Alabama One was "the worst managed credit union he had ever seen in 27 years," and that he undertook to "join into the conspiracy between state officials and private individuals to take over Alabama One through a state-level conservatorship. The United States removed the cases to federal court and filed a motion to substitute itself as a defendant in place of Cantor with respect to the plaintiffs' tort claims. The United States and Cantor then immediately filed a motion to dismiss and a motion for summary judgment.

On February 15, 2018, the district court granted the motion for substitution and the motions to dismiss as to the United States and Cantor.[6] Because it dispensed with the constitutional law claims for failure to state a claim, the district court did not decide whether Cantor would be protected by qualified immunity. The district court then converted the tort claims into Federal Tort Claims Act ("FTCA") claims against the United States because Cantor was acting within the scope of his authority as a federal employee. The court then dismissed the FTCA claims against the United

---

[6] Because the motions and legal issues in the cases are basically identical, the district court used the same analysis, even attaching and incorporating its opinion in the Carruth case into its dispositive memorandum and order in the Powell case.

11

States because Carruth had failed to exhaust his administrative remedies under the FTCA. The district court denied the plaintiffs' subsequent motion to amend their complaint.

Meanwhile, ACUA and Moore filed motions for summary judgment on August 29, 2017 in one case and September 15, 2017 in the other. On February 23, 2018, the district court granted summary judgment in favor of ACUA and Moore on all the constitutional, tort, and state law claims, with the exception of a state statutory claim—a petition to show cause under Ala. Code § 5-17-8—which the district court remanded to state court. In particular, the district court found that (1) Moore was entitled to absolute immunity on claims against her in her official capacity, (2) Moore was entitled to qualified immunity on the constitutional claims, (3) the claims that Ala. Code. § 5-17-8 is unconstitutional were due to be dismissed, (4) several state-law claims were precluded by Ala. Code § 5-17-8(m) or otherwise failed, (5) the plaintiffs were not entitled to amend their second amended complaint, and (6) the plaintiffs were not entitled to conduct additional discovery under Rule 56(d).

### 2. Appeal No. 18-13272

In 18-13272, Carruth brought an action against the private lawyers Smyth and Lewis, as well as Lewis, Smyth, Winter, & Ford, LLC, for their part in the alleged conspiracy to use the oversight of ACUA to pressure Alabama One and its

12

CEO and board to settle lawsuits with Smyth's and Lewis's clients on favorable terms.[7] Although 18-13272 was not consolidated with the other two cases, we address it in the same opinion because it arises from the same facts.

Carruth filed this action in the district court on June 29, 2015, the day before ACUA issued the Examination Report detailing its conclusions about Alabama One. It alleged constitutional violations under 42 U.S.C. § 1983 including illegal searches and seizures; retaliation; and denials of equal protection, substantive due process, and the right of petition. It also alleged state torts including tortious interference, intentional infliction of emotional distress, defamation, trespass, breach of fiduciary duty, abuse of process, invasion of privacy, civil conspiracy, and violations of Ala. Code § 5-5-370.

Smyth passed away on February 10, 2017, and on February 9, 2018, the district court granted a motion to dismiss the claims against Smyth.

On July 9, 2018, the district court granted the defendants' motion for summary judgment and denied as moot Carruth's motion for leave to file a supplement to his

---

[7] The same facts were at issue in yet another appeal before this Court, *Carruth v. Byrne*, 942 F.3d 1047 (11th Cir. 2019) ("*Carruth I*"). In that case, Carruth sued then-Governor Bentley and David Byrne, his chief counsel, raising an array of constitutional civil rights claims under § 1983, as well as supplemental state law claims. Notably, Governor Bentley and Byrne were originally defendants in No. 18-13272 but were dismissed from the case without prejudice, so Carruth pursued a separate action against them. The district court ultimately dismissed all of the civil rights claims against Governor Bentley and Byrne on qualified immunity grounds, and we affirmed on appeal. *Id.* at 1063.

response to the motion for summary judgment. His motion to supplement sought to add his expert's report, which addressed the Examination Report.[8] While the district court did find that, viewed in the light most favorable to Carruth, there was a genuine dispute of material fact "as to whether Defendants' actions were primarily directed toward obtaining a favorable settlement in their lawsuits through undue regulatory pressure, rather than a legitimate government action" and as to whether the defendants defamed Carruth, the court ultimately concluded that Carruth had not shown sufficient evidence to establish a connection between the defendants' actions and Carruth's termination such that he could establish injury. Carruth appealed both orders.

## II.

In 18-11192 and 18-11176, the plaintiffs appeal the district court's February 15, 2018, parallel orders granting the motions to dismiss the claims against Cantor and the United States. In 18-13272, Carruth appeals the district court's dismissal of all claims against Smyth and its grant of the defendants' motion to dismiss. This Court reviews a grant of a motion to dismiss *de novo*. *McKusick v. City of Melbourne*, 96 F.3d 478, 482 (11th Cir. 1996).

---

[8] Carruth renewed this motion to supplement the record on appeal with his expert's report and this Court granted that motion on October 26, 2018.

14

In 18-11192 and 18-11176, the plaintiffs also appeal the district court's February 23, 2018 orders granting summary judgment in favor of ACUA and Moore, and the July 9, 2018 grant of summary judgment in favor of the remaining defendants in 18-13272. This Court reviews a grant of summary judgment *de novo* and will "construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016). In doing so, the Court will "apply the same legal standards that bound the district court." *Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1341 (11th Cir. 2007). A motion for summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In 18-11192 and 18-11176, the plaintiffs also appeal the district court's denial of their request to amend their complaint. This Court reviews such denials for abuse of discretion. *Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 746 (11th Cir. 2014).

In 18-11192 and 18-11176, the plaintiffs also appeal the district court's denial of their request for relief under Rule 56(d). This court reviews a "district court's denial of a Rule [56(d)] motion under the abuse of discretion standard." *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1315 (11th Cir. 1990) (originally referring to Fed. R. Civ. P. 56(f), the predecessor of present 56(d)).

15

## III.

We proceed to the merits, and address cases 18-11176 and 18-11192 together, followed by 18-13272. With the discussion of each case, we address the various orders appealed by the plaintiffs in turn.

### A. Appeal Nos. 18-11176 & 18-11192

The plaintiffs raise 16 identical issues on appeal in each of these cases. We address all the issues, but consolidate some of them because they turn on similar issues of fact or law. Because the arguments in the briefs are virtually identical, our analysis does not distinguish between the cases, except where necessary.

1. Grant of Motion for Summary Judgment

a. First Amendment - § 1983 Conspiracy Claim

The plaintiffs argue that the district court erroneously disregarded evidence of a conspiracy among Moore, the other defendants, and Smyth and Lewis, to suspend and then fire the plaintiffs, and to place Alabama One into conservatorship. "A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right," and "must show that the parties 'reached an understanding' to deny the plaintiff his or her rights." *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990)). "For a conspiracy claim to survive a motion for summary judgment '[a] mere "scintilla" of evidence . . . will not suffice; there must be enough of a showing that

16

the jury could reasonably find for that party.'" *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1284 (11th Cir. 2002) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). Simply put, the plaintiffs "must show some evidence of agreement between the defendants." *Id. See also Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992) ("[T]he linchpin for conspiracy is agreement.").

Here, the plaintiffs have failed to offer even a "scintilla" of evidence of a conspiracy. The plaintiffs simply point to Smyth's and Lewis's motivations to influence Moore and ACUA in the oversight of Alabama One—and to be sure, there is evidence that Smyth and Lewis wanted certain outcomes, including the conservatorship of Alabama One. But when asked at oral argument what evidence supported a conspiracy, the plaintiffs pointed to Smyth's and Lewis's messages to and lobbying of various government officials, and the circumstances of Moore's appointment as administrator—implying that Moore was improperly influenced by the Office of the Governor. What plaintiffs did not present, either at the argument, in the briefing, or in the district court, was any evidence of an agreement with, meeting of the minds with, or other feedback from Moore or other government officials indicating that the actions against Alabama One or the plaintiffs were in any way the result of a conspiracy with Smyth and Lewis. *See Grider*, 618 F.3d at 1260.

17

What the evidence demonstrates instead is that Moore's appointment was part of the normal political appointment process. Moreover, Moore's actions were in response to the 2015 Examination Report, which was prepared by ACUA and NCUA examiners. And despite plaintiffs' expert's disagreement with the contents of the Examination Report, the plaintiffs have shown no evidence whatsoever that the Examination Report was the product of outside influences. At the summary judgment stage, when discovery has been completed and plaintiffs have had the opportunity to present evidence of a conspiracy, the district court did not err in finding that they had not met their burden of showing that the parties reached an agreement to deny them their rights.

This same alleged conspiracy is the foundation of most of the claims in the three cases before us. Because the plaintiffs have failed to show a conspiracy between the defendants, any of their claims that rely on that conspiracy were correctly disposed of by the district court for that reason.

b. Moore's Qualified Immunity

Plaintiffs next challenge the court's decision that Moore is entitled to qualified immunity. To be entitled to qualified immunity, a government official must show that he was acting within the scope of his discretionary authority—and if he was, the plaintiff can prevail only if the plaintiff shows the defendant violated (1)

18

constitutional rights that (2) were clearly established. *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016).

The plaintiffs first argue that Moore was acting outside the scope of her discretionary authority. Their arguments rest on the assertion that even if Moore was engaging in the types of conduct authorized for an ACUA administrator to do (overseeing a conservatorship and terminating employees), she still must do so "in an authorized manner." *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). By being "corrupted by improper outside influence to accomplish non-governmental objectives," plaintiffs assert, Moore's conduct fails this test. However, as we recently explained in the case involving Carruth and similar allegations against Byrne and former-Governor Bentley, "[t]his argument has been rejected by our precedent: at this stage in the [qualified immunity] analysis, we 'temporarily put [] aside the fact that [the official's actions] may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'" *Carruth I*, 942 F.3d at 1055 (second and third alteration in original) (quoting *Holloman*, 370 F.3d at 1266)). To be clear, "[i]n this setting, we do not ask whether the defendant[] acted illegally, because '[f]ramed that way, the inquiry is no more than an "untenable" tautology'" and would allow a plaintiff to "plead around qualified immunity simply by saying that the official was animated by an unlawful

19

purpose." *Id.* (quoting *Harbert Int'l Inc. v. James*, 157 F.3d 1271, 1282 (1998)). Rather, "[f]or present purposes, the question is whether the official's actions are of the sort that fall within the '"arsenal" of powers' the official is given to 'to accomplish her goals.'" *Id.* (quoting *Holloman*, 370 F.3d at 1267)). Moore's actions in overseeing a conservatorship and terminating employees was clearly within the scope of her discretionary authority. Thus the burden falls to Carruth to show that Moore and ACUA violated (1) constitutional rights that (2) were clearly established. *Melton*, 841 F.3d at 1221. We turn now to consider each of the rights that the plaintiffs allege that Moore violated.

### i.    *Equal protection*

First, the plaintiffs advance an equal protection claim, relying on *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), which noted that Supreme Court cases "have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." But here instead of comparing his treatment to others similarly situated, Carruth argues that Moore treated the 2015 version of Carruth differently than the 2012 version of Carruth, and thus violated the Equal Protection Clause. We rejected this same theory in *Carruth I*, concluding "that the class of one equal protection theory has no application to the decision to place Alabama One in conservatorship

20

or to terminate Carruth as its CEO." 942 F.3d at 1058. Moreover, as we observed in *Carruth I*, "and equally fatal to this claim, Carruth's attempt to use a prior version of himself . . . as a comparator finds no support in our case law." *Id.* And, to the extent this is an issue of first impression, Moore is "almost certainly entitled to qualified immunity, since there is rarely a clearly established violation of law in the absence of supporting case law." *Id.* Accordingly, the district court properly determined that Moore was entitled to qualified immunity on this claim.

### ii.    *Due Process*

Next, the plaintiffs assert a due process claim. It is unclear of what exactly their due process claim consists, but it appears that their argument to the district court essentially boils down to a procedural due process violation based on their frustration at ACUA and Moore firing them without first granting them notice or a hearing, which was done pursuant to Ala. Code §§ 5-17-8(m),[9](n).[10] To support a claim for deprivation of procedural due process under §1983, a plaintiff must show

---

[9]Ala. Code § 5-17-8(m) provides:

> After taking possession of the property and business of a credit union through conservatorship, the conservator may terminate or adopt any executory contract to which the credit union may be a party. The termination of any contracts shall be made within six months after the conservator has obtained knowledge of the existence of the contract or lease. Any provision in the contract or lease which provides for damages or cancellation fees upon termination shall not be binding on the conservator or credit union. The directors, the conservator, and the credit union are not liable for damages arising from or relating to such executory contracts.

[10] "The administrator may appoint a temporary board of directors to any credit union subject to conservatorship." Ala. Code § 5-17-8(n).

21

"(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally . . . inadequate process." *J.R. v. Hansen*, 803 F.3d 1315, 1320 (11th Cir. 2015) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).

Even if we assume (without deciding) that the plaintiffs possessed some property interest in their employment at Alabama One, that interest was limited by being subject to termination after conservation by ACUA or NCUA. *See* Ala. Code § 5-17-8(m),(n); 12 U.S.C. § 1786(g).[11] Further, regarding the third prong of the procedural due process analysis, Plaintiffs have failed to explain why the procedural safeguard of Ala. Code § 5-17-8(g), which affords judicial review of a conservatorship for a terminated official of a conserved credit union,[12] is

---

[11] The plaintiffs argue that the enactment of Ala. Code § 5-17-8(m) after they had begun their employment is an *ex post facto* deprivation of their property interests in that employment. This argument is also unavailing, as their employment was always subject to termination under conservation of the credit union, at least by 12 U.S.C. § 1786(g), which predated their employment.

[12] Ala. Code § 5-17-8(g) provides:

> Not later than 10 calendar days after the date on which the Alabama Credit Union Administration takes possession and control of the business and assets of a credit union pursuant to subsection (f), officials of the credit union who were terminated by the conservator may apply to the circuit court for the judicial circuit in which the principal office of the credit union is located for an order requiring the administration to show cause why it should not be enjoined from continuing possession and control. Except as provided in this subsection, no court may take any action, except at the request of the Credit Union Board by regulation or order, to restrain or affect the exercise of powers or functions of the board as conservator.

22

constitutionally inadequate. Thus, the plaintiffs have failed to show that Moore violated their constitutional rights.

Plaintiffs have also failed to show that the claimed rights are "clearly established." "A right is clearly established if a reasonable official would understand that his conduct violates that right." *Melton*, 841 F.3d at 1221. In light of the statutory authority to place Alabama One into conservatorship, a reasonable ACUA administrator would understand that she was authorized to place Alabama One into conservatorship and to terminate officials.

### iii.    *First Amendment*

As a final constitutional claim, the plaintiffs look to the First Amendment. They challenge the district court's conclusion that they did not show Moore violated their First Amendment rights by retaliating against them for their exercise of those rights.

To establish a First Amendment retaliation claim, a plaintiff must allege "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). The second prong is an objective standard, meaning "[a] plaintiff suffers adverse action if the defendant's

23

alleged retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254.

Regarding the first prong, it is not clear exactly what the plaintiffs define as their protected speech. Their briefs imply that their First Amendment activity was defending themselves "and Alabama One in the Smyth Lawsuits, challenging the improper suspensions imposed by ACUA, initiating litigation to defend against the improper actions of Moore and others, and initiating litigation against Moore and others for damages suffered from the wrongful conduct of Moore and others." Nevertheless, the parties do not dispute, for present purposes, whether the plaintiffs engaged in protected conduct or whether the purported retaliatory action had an adverse effect that would deter "a person of ordinary firmness" from exercising their First Amendment rights.

Rather, the parties, like the district court, focus on the third prong of the First Amendment retaliation analysis: causation. The district court applied *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996), where we established that "[w]here the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." In applying *Foy*, the district court determined

24

that Moore had an objectively reasonable—i.e., lawful—basis for her action, and thus summary judgment was appropriate.

The plaintiffs take issue with the district court's application of *Foy* arguing that Moore's actions were undisputedly unreasonable based on "unlawful motivations" because "no objectively reasonable Administrator of an independent state agency would follow the dictates of individuals outside of her agency." As we have already addressed, however, the plaintiffs have failed to provide sufficient support for the alleged conspiracy, and allegedly "unlawful motivations" are irrelevant at this stage to the qualified immunity analysis. *Carruth I*, 942 F.3d at 1055. Thus, summary judgment on this issue is appropriate.

c. Whether Ala. Code § 5-17-8 Violates the Equal Protection Clause or the Due Process Clause

Plaintiffs argue that Alabama Code § 5-17-8 violates the Equal Protection Clause and Due Process Clause by citing to their arguments that Moore's conduct violated those Clauses. For the same reasons we found those arguments unavailing when applied to Moore's conduct those arguments fail here.[13]

---

[13] For their Due Process Clause argument, the plaintiffs also argue that they are asserting a facial challenge and that the Supreme Court precedent supports that assertion. They cite no cases in support of their argument, and offer no additional reasoning why the statute deprives them of a property interest without due process. Their brief to the district court discusses *Gilbert v. Homar*, 520 U.S. 924, 934–35, (1997), which enumerated three factors to "determine what process is constitutionally due," specifically (1) "the private interest that will be affected by the official action; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest." *Id.* The plaintiffs offer no analysis of these factors, and we are therefore

25

d. AAPA

In 18-11176, the plaintiffs challenge the conservatorship under the Alabama Administrative Procedure Act (the "AAPA") Ala. Code §§ 41-22-1–41-22-27. In particular, they challenge the district court's holding that because ACUA is not an "agency" as defined by the AAPA, plaintiffs were not entitled to relief under the AAPA (i.e., notice and hearing). To the contrary, plaintiffs assert ACUA *is* an agency and thus the protections in the AAPA apply.

We do not have to reach the question of whether ACUA is an agency. The AAPA provides certain rights to a party only in a "contested" case, which it defines as proceedings "in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." Ala. Code § 41-22-3(3).[14] Because § 5-17-8(f) does not otherwise require a hearing before the ACUA can place Alabama One into conservatorship, it is not a "contested case"

---

unpersuaded that the procedural safeguard of Ala. Code § 5-17-8(g) is constitutionally inadequate.

[14] The definition in full:

> Contested case. A proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing. The term shall not include intra-agency personnel actions; shall not include those hearings or proceedings in which the Alabama Board of Pardons and Paroles considers the granting or denial of pardons, paroles or restoration of civil and political rights or remission of fines and forfeitures; and which are exempt from Sections 41-22-12 through 41-22-21, relating to contested cases.

Ala. Code § 41-22-3(3).

26

under the AAPA.  For that reason, we affirm the district court's decision on this issue.

### 2.  Denial of Motion for Leave to Amend

Plaintiffs challenge the district court's denials of their requests for leave to amend their complaint and file a third amended complaint. In its denial, the court wrote that "[a]llowing Plaintiffs to amend their current complaint will cause undue delay in an action that has already been plagued by repeated delays," and that amendment would prejudice the defendants.

A party may amend its complaint only once as a matter of course. Fed. R. Civ. P. 15(a)(1). After that, "[t]he court should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). Reasons that justify denial include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The significant undue delay and prejudice that the district court cited in its opinion are more than enough to justify its denial of the motion for leave to amend. The district court also pointed out that the plaintiffs had not shown "why they were unable to insert the information, claims, or defendants they [sought] to add in their third Amended Complaint to prior complaints."  Plaintiffs argue that the failure to

27

add such detail to their previous amendments was a "tactical" decision they are entitled to make. Indeed, it is a tactical decision they are entitled to make—and the district court did not abuse its discretion when it declined to accommodate that tactical decision. We affirm on this issue as well.

### 3. Denial of Rule 56(d)[15] Request for Relief

Carruth argues that the district court erred in denying his Rule 56(d) Motion.[16] He argues that a discovery order in No. 18-13272 should have allowed him to prevail on his Rule 56(d) motion.

Rule 56(d) "allows a party who has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." *Fla. Power & Light*, 893 F.2d at 1316 (quotations omitted). "The district court is not required to await the completion of discovery before ruling on a motion for summary judgment," but it "must ensure

---

[15] Federal Rule of Civil Procedure 56(d) provides:

 When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

[16] Carruth filed a 56(d) motion (which the court denied) in his case, but Powell did not. Yet Powell argues that the court should have granted his 56(d) motion. The inclusion of this argument in his brief appears to be an error.

28

that the parties have an adequate opportunity for discovery." *Id.* A nonmovant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts, but rather he must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983) (quotations omitted).

Discovery orders in 18-13272, which was not consolidated with these cases in the district court, have no bearing on Carruth's ability to pursue certain discovery here. The district court listed numerous reasons why Carruth had adequate opportunity for discovery, including the long period of time available and the numerous earlier opportunities to file his Rule 56(d) motion. For those reasons, the district court did not abuse its discretion in denying the Rule 56(d) motion.

4.  United States' Motion to Dismiss

The plaintiffs also challenge the district court's grant of the United States' motion to dismiss and do so on several grounds. They reiterate their arguments for leave to amend (though the district court did not address any motion to amend in its grant of the motion to dismiss), assert that the United States was improperly substituted as a party, and suggest—without plausible facts to support the assertion—that "Cantor was a rogue federal agent who was acting outside of any

29

'formal actions by the NCUA,'" rendering the United States' notice of substitution ineffectual. They also allege the same constitutional violations against Cantor that they alleged against Moore.

For all the reasons we articulated above regarding the lack of evidence to support the alleged conspiracy, the district court did not err in granting the United States' motion to dismiss. As to Cantor, the plaintiffs' second amended complaint did not meet the burden of providing "allegations plausibly suggesting (not merely consistent with) agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a . . . claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's . . . efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a . . . complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.

*Id.* (quotations omitted). The complaint offered no evidence of an agreement or conspiracy—no "factual enhancement"—that would create liability for Cantor. Thus the district court's dismissal of the claims against Cantor and the United States was proper.

Moreover, the United States was properly substituted in this case, and Carruth has shown no facts to support its allegations that Cantor acted outside the scope of his employment. The United States "must remain the federal defendant in the action

30

unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley*, 549 U.S. 225, 231 (2007).

## B.  Appeal No. 18-13272

### 1.  Summary Judgment

In 18-13272, brought by Carruth against the private attorneys, Smyth and Lewis, and their law firm, Carruth challenges the district court's grant of summary judgment in favor of the defendants on myriad grounds. We first enumerate the arguments, finding that they all hinge on the existence of the same alleged conspiracy. We then find that Carruth has failed to show a genuine issue of material fact with regard to the existence of that alleged conspiracy, so we affirm the district court on these issues.

First, Carruth brought several constitutional claims related to his 2014 suspension and 2015 termination, alleging that Smyth and Lewis were involved in a conspiracy with government officials to deprive him of his constitutional rights. In granting summary judgment, the district court found that despite Smyth's dismissal from the case (and the fact that most of the communications with government officials were from Smyth), it would assume in its analysis that Carruth had shown a genuine issue of material fact as to "whether all Defendants participated in the

31

agreement to suspend Carruth." Even so, the district court found that Carruth had not shown any constitutional injury from his suspension.

Second, with regard to his suspension in 2014, Carruth argues that the district court erred by finding that the suspension did not arise to a deprivation of his liberty interest. Carruth's theory is that the conspiracy among Smyth, Lewis, and government officials to suspend him resulted in the reputational harm. "In order to establish that a deprivation of a public employee's liberty interest has occurred without due process of law, the employee must prove that: (1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for employee name clearing. *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). The district court applied the "stigma-plus" test created by *Paul v. Davis*, 424 U.S. 693 (1976). Under that test, "a plaintiff claiming a deprivation based on defamation by the government must establish the fact of the defamation 'plus' the violation of some more tangible interest before the plaintiff is entitled to invoke the procedural protections of the Due Process Clause." *Cannon*, 250 F.3d 1299, 1302 (11th Cir. 2001).

Third, with respect to Carruth's termination, he argues that the defendants are guilty of conspiring to commit constitutional violations. Although his initial brief is unclear as to what constitutional violations, the defendants' response and Carruth's

32

reply brief mention equal protection, due process, and takings claims. As in 18-11192, Carruth also insists that he had a property interest in his employment, and so his firing without a hearing violated his constitutional rights.

Fourth, Carruth alleges that somehow the private individual defendants, in conjunction with the Office of the Governor and others, were able to get the provision that is now § 5-17-8(m) of the Alabama Code (granting authorization to a conservator to terminate contracts to which the credit union is a party) included in new legislation in order to enable Moore to fire Carruth, and that this conduct somehow constituted tortious interference with a business relationship. "Under Alabama law, the tort of wrongful interference with a business relationship has five elements: (1) the existence of a protected business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1302 (11th Cir. 2010). In order to bring this claim against the defendants, this argument too assumes a conspiracy among, Smyth, Lewis, and the government officials.

Lastly, Carruth also asserts that the district court erred by granting summary judgment for the defendants on his claim that Smyth's and Lewis's statements to regulators constituted defamation. Under Alabama law, "[t]o establish a prima facie case of defamation, the plaintiff must show (1) that the defendant was at least

negligent, (2) in publishing (3) a false and defamatory statement to another (4) concerning the plaintiff, (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So.2d 1085, 1091 (Ala. 1988) (citations omitted). The district court determined that Smyth and Lewis's statements were "actionable per quod"; thus, Carruth must show damages for the statements to be actionable. Carruth argues that the court erred in two ways: (1) holding that there was insufficient evidence to tie the defendants' conduct to his termination (as discussed above); and (2) that the court disregarded a category of special damages for attorney's fees and expenses "as a result of the improper regulatory activity prompted by the defamation." Consequently, this claim also requires Carruth to provide evidence of the alleged conspiracy.

All these arguments fail for the same reason. The numerous and disparate legal theories which Carruth raises hinge on the same factual assumption: Smyth and Lewis were engaged in a conspiracy with state officials and regulators to place Alabama One into conservatorship and suspend—and later fire—Carruth. The district court concluded that Carruth had offered "the barest of evidence of *any* contact between Moore and the Defendants," much less evidence of a conspiracy, and we agree. As the district court accurately described, Moore's replies to Smyth's communications were "noncommittal and objective," and the nature of the

34

communications shows Moore was "not part of the conspiracy, and because she was the ultimate decision-maker and cause of Carruth's termination, Defendants cannot be liable for acts Moore committed."[17]  Similarly, Carruth points to no evidence that the defendants had any discussions with government officials specifically about the new legislative provision that became Alabama Code § 5-17-8(m).  In short, the district court did not err in granting summary judgment on these issues.

Citing no case law to support the proposition, Carruth argues that his burden in his case against Smyth and Lewis is not as heavy as his case against Moore, because even if Moore was not in on the conspiracy, she was an "instrumentality of the conspiracy between the defendants," Governor Bentley, and Byrne.  It is not clear how Moore could be simultaneously an "instrumentality of the conspiracy" and not part of the conspiracy herself. Regardless, this argument does not change the dispositive fact noted by the district court: Moore "was the ultimate decision-maker and cause of Carruth's termination." The district court correctly found no dispute of

---

[17] Carruth's suspension occurred when ACUA was under Morgan's leadership, not Moore's. There, too, Carruth has failed to show the existence of an unlawful conspiracy. The district court, taking the facts in a light most favorable to Carruth, saw "a dispute of material fact as to whether there was an agreement to suspend Carruth" among Smyth, Byrne, and Governor Bentley."  But the district court was quick to note that this finding did not mean such an agreement was unlawful, and it made no such determination because it found no constitutional injury. We also note that this finding was solely as to Smyth, who has been dismissed from the case, and not Lewis.

material fact regarding the defendants' role (or lack thereof) in Carruth's firing, and summary judgment was appropriate.

### 2.  Motion for Leave to Supplement Response

Carruth also seeks reversal of the district court's denial of his motion for leave to supplement the evidentiary record with his expert's report on the financial health of Alabama One. He made the same motion on appeal, and this Court granted Carruth's motion to supplement the record on appeal on October 26, 2018. We review the district court's grant of summary judgment *de novo*, and have the benefit of access to the supplemental material, so this issue is now moot.

### 3.  Motion to Dismiss Smyth from the Case

Smyth passed away on February 10, 2017. Counsel for the defendants served Carruth with a "Suggestion of Death" on February 16, 2019.  Carruth nevertheless argues that the district court erred by dismissing Smyth from the case under Federal Rule of Civil Procedure 25.[18] Rule 25(a)(2) states that "[i]f the motion [for

---

[18] Rule 25(a) of the Federal Rules of Civil Procedure provides in full:

(a) Death.

(1) Substitution if the Claim Is Not Extinguished. If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

(2) Continuation Among the Remaining Parties. After a party's death, if the right sought to be enforced survives only to or against the remaining parties, the action

36

substitution] is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Carruth argues that the statement noting the death was not "served" in accordance with Rule 5, as dictated by Rule 25(a)(3), and thus there was no 90-day deadline for him to file a notice of substitution of a successor or representative.

The question turns on whether the "Suggestion of Death" was sufficient to start the 90-day deadline. Carruth relies primarily on *Atkins v. City of Chicago*, 547 F.3d 869, 873 (7th Cir. 2008), which stated that "nonparties with a significant financial interest in the case, namely the decedent's successors (if his estate has been distributed) or personal representative (it has not been), should certainly be served." Thus, because Smyth's representative or successors were not served with the notice of death, Carruth argues that nonparties were not served as provided in Rule 4, as required by Rule 25(a)(3), and he claims that the 90-day clock never started. The defendants, on the other hand, argue that because Smyth had "no estate and no successor," there was no unserved non-party.

---

does not abate, but proceeds in favor of or against the remaining parties. The death should be noted on the record.

(3) Service. A motion to substitute, together with a notice of hearing, must be served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4. A statement noting death must be served in the same manner. Service may be made in any judicial district.

Carruth was properly served under Rule 25, and that fact is not in dispute. And by every indication Smyth had no representatives of his estate or successors. As the district court noted, "[t]o insist that Defendants serve a nonexistent, non-party makes no sense and would create an infinite loop whereby no valid Suggestion of Death is ever filed because there is no personal representative of Defendant Smyth. The result being a never-ending case." We affirm.[19]

## IV.

In conclusion, the decisions of the district court are

**AFFIRMED.**

---

[19] We note that even if Smyth was still properly a party in this case, Carruth failed to show a genuine issue of material fact regarding the alleged conspiracy and the district court correctly granted summary judgment for the remaining defendants. That same reasoning would apply to Smyth.